Your Honor, it's John Seidlitz for the plaintiff, Kevin Loader. I'd like to reserve three minutes for rebuttal. It's my honor to be here representing Kevin Loader. Kevin is an individual who applied for Social Security disability benefits, was denied at the administrative level, pursued through hearing, denied there, followed the requisite appeals, and we ended up in district court in Montana where the magistrate reviewed and affirmed the commissioner's decision. We are here seeking the court's review of the basis for the denial. Now, the Social Security decisions are factually based. They're intense in facts. And what happens in the case with Kevin Loader is he presents he has two different types of issues. One is physical. He's got a thoracic problem. Can you just focus on the back pain as opposed to the depression? Yeah, the back pain. He suffers from compression at T6, 7, T7, 8. It's a long-term predated. His disability date became worse. Continued treatment through the VA, both in terms of chiropractors, AMD, Dr. Meyer, and various nurse practitioners. Beginning in December of 2012. Rather than give us a factual narrative, maybe just zero in on what you think the ALJ did wrong with respect to the back pain. Well, what he did was he said. . . In refrigerators or washing machines. . . He moved the washing. He lifted a washing machine. If he had said move the washing machine, I'd have to present with a completely different argument. But basically what he did was he said that the back is not as limiting as what Kevin said. I don't believe him. I don't believe the doctor who has said he's disabled. The doctors limited him to about four hours a day. The MD doctor. So that's Dr. Meyer, right? Dr. Meyer. I mean, if Dr. Meyer's opinions are credited, there's no question that this gentleman is disabled, right? Correct. And so what was the ALJ's basis for basically giving. . . Well, because he thought my client had lifted the washing machine. And if you can lift the washing machine, that exceeds what Dr. Meyer said your limits are. And if I remember, your client, he never said he lifted it. He said he tried to move it and in the process, I guess, pretty seriously injured his back. Yes. And even the moving part aggravated the back. Second thing that the ALJ did to discount Dr. Meyer's opinion and the magistrate affirmed that evaluation was he said that he went to California. It took the long flight. Which is way too long to get to California. It clearly has to exceed Dr. Meyer's limitations. And so we can speculate. I guess I get to because the ALJ did nothing to evaluate that. Picked it out of the medical record and said, okay, now I'm not going to believe you because that's there. He didn't ask him if he flew Delta, which would dump him in Salt Lake for three, four hours before you continue on to California. There are Allegiant flights direct from Great Falls to California. It's got two hours and that fits in the limits. But I guess, tell me if I'm wrong on this. I guess I didn't think that was that significant because somebody could certainly endure quite a bit of pain to get from point A to point B, but that doesn't necessarily mean they can then sit or stand or whatever for eight hours a day, 40 hours a week. I would agree with that. So I remember those as being the two things in terms of your client's, I guess, testimony about his other activities that the ALJ relied on. Is there anything more than that? There's two other things. One is before his dated disability, he mowed a lawn. In August of 12, he had mowed a lawn and he had reported to the doctor that he had a tough time pushing his shopping cart, but he had mowed a lawn three months, four months before his dated disability. Okay. That seems like a conflict. Well, it's not a conflict to the extent that before disability, symptoms can wax and wane. In other words, when you hit disability date, you've got to establish 12 months of continuous disability. And so whoever decided December of 2012 was a disability date determined as of that date the symptoms have now become at least permanent enough to be 12 months. Sorry, just the timing between when he supposedly was mowing the lawn and when he said he couldn't push the shopping cart, what's the gap? They're both, I think, in August of 2012. Okay. I see. But that's four months before the disability date. ALJ also noted that Dr. Meyer at some point had encouraged Mr. Loder to do some job retraining. That is not true. That note is not in the treatment notes? That is not in the treatment notes. That's in the ALJ finding and it's in the magistrate's opinion. And there's no support for it in the record? What the record says, and it's in the reply brief, is that my client, Kevin Loder, is into Myers and says, I can't do my old job. And Doc says, yes, you can't do your old job. And he says, you know, I'm thinking of looking at retraining. And the doctor says, I think that's a good idea. Well, if the doctor had said, I don't think you're able to work at all, so don't waste your time on job retraining, you might have a point. But if the doctor's encouraging him to do some job retraining, where's the error in the ALJ citing that as one of the factors that he's not totally disabled? It's the opposite analysis. The doc doesn't come in and see someone who the doc thinks, this guy needs, for whatever reason, mental improvement, physical improvement, improvement of society, this guy needs to go back out and get a job. That's not what happened. The doctor did not evaluate him and say, here's somebody that could still go out there and get in the trenches and do some work. That's what the judge found. That's what the ALJ found. The doctor determined he should seek retraining. The whole different thing happens when you come into the... I guess we're parsing the evidence here, but why on a substantial evidence review standard can the ALJ not rely on that particular piece of evidence to support a conclusion that the claimant is not completely disabled from any work at all? What we don't have, because the judge didn't seek any information from the doctor and he didn't seek any information in questioning Kevin Loader, to say, now what kind of retraining are we talking about? In fact, did you ever do it? Did you ever go out and apply through the local job service for any retraining? Did you go to Easter Seals? Did you do anything? What were you thinking about in terms of retraining? Are you looking at the greeter job at Walmart? What was the retraining that was considered? He was represented. You represented him at the hearing, did you not? Yes. Okay. So I guess at what point does the ALJ have the duty to further develop the record as compared to the burden on the claimant to show that he sought job retraining but there wasn't anything he was able to do because of his condition? Well, the problem we have is when you're sitting at the hearing, you have no idea what the ALJ is going to latch on to in terms of reference in a record. This is a reference in a medical record where my client goes in and says, you know, I'm thinking about retraining, and the doc says, yeah, I think you should consider that. That's innocuous to me. I haven't got the ability. I'm just not that smart to be able to predict. The judge is going to jump on this and say, that establishes Dr. Meyer's opinions should be given no weight because there was not a question posed by the ALJ at the hearing to even give a hint that he was going to latch on to these things. Counsel, I'm interested in the depression issue. To what extent are you relying on the finding that depression is a medically determinable impairment at step two? Well, I think to what extent? I think independently there's a basis to win on the physical component. I think independently there's a basis to win on the depression. And what happens is the depression is found by the treating Dr. Meyer's. He's medicated for depression. He is treated by VA nurse practitioners. Well, there's no question that the ALJ found that there was depression, so you don't have to defend it. But my question is, was that brought to the attention of the expert at step five? No. And to what extent is that of concern? It's not brought up at all. And the reason is the ALJ relied upon an independent expert at the time of the hearing who came in and said, I've looked over the relevant medical records, whatever those are, and I think the limitations are mild. And therefore, the ALJ said, I'm not going to include any of those limitations because they're only mild, according to Dr. Vervalde. They're only mild, so I don't need to incorporate those to the vocational consultant. So there were not emotional component limitations incorporated into jobs. Well, just to be precise, did the ALJ consider at step five the depression issue or did he simply ignore it? I would be stating something I can't remember. I know if it was presented, it was presented as no more than mild limitations. And by that, I think what he did to the vocational consultant. So the expert was aware of that condition? The expert isn't told that there's depression. The expert's told, I want you to assume there's a claimant whose ability to concentrate is only mildly impaired and their ability to focus is only mildly impacted. And so the expert doesn't take depression and factor it in. They take the limits that the ALJ provides. But doesn't the listing require that it be severe? Yes, and severe only requires an impact more than a minimal impact. In other words, if it has at least a... So your argument is that mild is equivalent to severe? No. I think mild is equivalent to severe. I think it is. The problem is when you say mild, if you say the limits on concentration, persistence, and pace are only mild, you don't incorporate what the medical treating physicians found were the limitations, which were moderate. Dr. Myers found that he had moderate difficulties. And so the judge only presented mild difficulties in terms of depression. Does that make sense? I think so. I have to say every time I think I understand the five-step grids, I conclude after argument that maybe I don't. One of the panel's decisions that's come out has said the discussion needs to be made in the ALJ decisions as to each step as to what's considered. And it's a great opinion, and I'm going to start arguing that to my district courts to hopefully get that up here, because it's so hard when you focus on an issue at step two, arguing it wasn't included, when really the impact is at step five. And so the judge says, oh, depression. But I understood the grids to mean that by identifying the diagnoses at step two that produce severe limitations, that the Social Security grids then, grids are the wrong word, the step analysis, then requires that those severe limitations be included in the residual functional capacity determination. That's accurate. That's absolutely accurate. And what I face in arguments from counsel when I come up and say they didn't include limitations on depression at step two because the judge said depression isn't even severe, then they'll come in and say. So the ALJ concluded that whatever the depression was, it was not severe. Correct. And then presumably would not be relevant at the RFC stage. Except what I will usually face from opponents when we argue is that there's no error in leaving it out at step two because the judge considered it at step five. And the problem is it's like the ALJ is not asking the questions. If you're going to tell us at step two it's not severe, there's no evaluation on the impact. In other words, in this case what should have happened is there should have been an evaluation where the ALJ said the depression has an impact on him. And here's what I think it is. I think Dr. Vivaldi said it's mild, and I'm going to adopt mild as his limits. And that means he's going to don't put him in a room with more than five employees and keep him from too many people coming and going with him. As opposed to Dr. Meyer that I'm not going to believe who says his limits are moderate. So when you get to step five, the ALJ can evaluate, okay, here's what I gave to the vocational consultant, and he's testified even with those moderate limitations from the treating physician he can still work, which is why I think there's an independent basis to reverse on the physical thoracic, and there's an independent basis to reverse on the depression. You want to save the rest of your time? I'll give you a couple minutes. I would save the rest. Thank you. All right. Let's hear from the commissioner. Good morning, Your Honors. My name is Michael Howard, representing the Commissioner of Social Security. Your Honors, Mr. Loader injured his back in 2006 during a military training exercise, and that caused a compression fracture in his mid-back. He kept working for several years repairing hot tubs and painting houses, and the question for the ALJ in this case was whether he became completely disabled under the Social Security Act beginning in December 2012 from that same back injury. Can I ask just a preliminary question? Was it the same ALJ who had heard his earlier case? Yes, Your Honor. At the hearing, I think around page 85 of the record, the ALJ indicated that. And so I guess I'll just be up front with you. I found the ALJ's decision in this case to be one of the poorer ones. It was just not a very well done, not a very thorough decision. I'm frankly not inclined to uphold it, but I want to hear what you have to say about that. But I just wanted to get a sense. Is it because the ALJ just said, look, I've already listened to all of your complaints about, especially the back pain, you pick this arbitrary onset date that just happens to correspond, I think, with the earlier decision basically. So I just don't – is that the attitude? Like I just don't need to give that serious consideration to what's happened since because I've really done a thorough job already ruling against you, and you didn't bother – I don't think you bothered to appeal that or whatnot. Well, Your Honor, I would disagree as an overall matter, and hopefully I'm answering your question. I think the ALJ – of course, there's different lengths of ALJ decisions and different levels of detail. But if we really look at the ALJ decision in this case and we compare that to the underlying record, we see that the ALJ is really giving a fair summary of what's going on in the treatment notes. For instance, the other health care providers, like the nurse practitioners and such, that Mr. Loader is saying were ignored, were actually referred to and cited, NP Garza and NP White. Not really. I mean, there was almost no discussion of – a pretty wide array, actually, of non-MD type folks. I mean, most of – there was very little discussion of their views, and they were all consistent with what Dr. Meyer – the only – as I understand it, Dr. Meyer is the treating physician. There was no – there wasn't even another examining physician that the ALJ was able to rely on, right? That's correct, Your Honor. There was no examining. So, I mean, I guess our cases say that when the treating physician – I mean, if you're going to discount entirely the treating physician's views, and this wasn't even just a treating physician who saw the person on a one-off basis. This was a sustained relationship. You've got to be pretty thorough in documenting why you think that doctor's opinions are not to be believed, right? And that's what I guess I'm saying. I just found the ALJ's decision here to be totally unsatisfactory in that respect, because mostly – I think your opponent was right. Mostly what the ALJ pointed to were these two things that Mr. Loader mentioned, and I just don't find those as being, you know, so inconsistent with what Dr. Meyer found that we would just discount entirely his opinions. Your Honor's raised a few good points, but I would like to try and address as many as I could. Really, I think going straight to the issue of Dr. Meyer, I think the real issue is – and the ALJ noted this and was aware of it – is that Dr. Meyer was describing someone who was basically bedridden, that could only sit, stand, or walk for a few hours a day, could not even lift 10 pounds in a work setting, and was confined to bed and resting. And that was a fairly extreme level of limitation, especially given the mild findings on the imaging of the back. So the ALJ was questioning that, given some of these other inconsistencies in the record. And what we really see is that Mr. Loader will get injured doing different physical activities, and then he'll go to the doctor later because he overexerted himself. So some of these, like I believe the mowing the lawn, a couple of them were before the alleged onset date. But as Your Honor noted, the alleged onset date – I'm sorry – in December 2012 was only a creature of the legal process. He did claim to be disabled during that earlier time period as well. And the ALJ did point to some things occurring later, like the washing machine. And as far as the washing machine goes, the ALJ did use the term move on the same page and lift on the same page. So he used two different terms. And I think at no point did the ALJ suggest he lifted the entire washing machine or anything of that nature, very heavy in that nature. The ALJ only said it was consistent with – The result of trying to move – because it definitely was not lift – the result of trying to move the washing machine was that – didn't he end up having to go to the hospital or something? I mean, it was – I mean, I get the impression – maybe you just tell me if my big-picture view of this is wrong – I get the impression of somebody who actually does want to work. He did actually try to – I can't remember what he – tried a couple different things, and he just couldn't do it physically. He wants to try to have a normal life, but every time he does even little things, he's just put into excruciating pain and has to be flat on his back for days or ice pack or whatever. But I don't get the sense at all that this is somebody who is just making this up and that he really just wants to sit around and collect a disability check. He wants to try to be active, but he can't because his back prevents him from doing that. That may be another view of the evidence, Your Honor. Again, we do have the substantial evidence standard to review, though. I don't think the ALJ ever suggested that he was making things up as a – or completely exaggerating. The ALJ did limit him to a range of light work with some limitations on sitting and standing and walking beyond the normal light work range. But you have a doctor who – I agree with you. Dr. Meyer's limitations are pretty extreme. I was a little bit surprised by just how limited the doctor thought he was. But nonetheless, that person's an MD. I'm not. Neither is the ALJ, neither are any of us, right? But so it did seem that Dr. Meyer's opinions were heavily influenced, obviously, by the subjective reporting of pain from Mr. Loader. And so I then said, well, it seems to me that the main issue is whether the ALJ's adverse credibility determination is supported. And I just don't see how it is because there was the misstatement, really, of the lifting versus moving. And this thing about the plane ride just doesn't strike me as inconsistent with the ultimate limitations that Dr. Meyer found. Yes, Your Honor. Well, I'll table the issue of the washing machine for a moment because we did discuss that. As far as the flying to California, I think that that's an argument in the briefing from Mr. Loader's counsel. What the ALJ cited was Exhibit B2F-2, which is page 488 of the excerpts of record. And that's where Mr. Loader is talking to one of his health care providers, and he said he had more pain after, quote, doing a lot of walking on vacation in California, end quote. And that seems to depart from what he was saying to the ALJ at the hearing, which was I was basically living on my family member's couch for a few months. I didn't do anything else other than what I normally do. So this is an example that the ALJ was pointing to, is that while Mr. Loader said he was highly limited at the hearing and needed a cane and could only go to the store a couple times a month, that was certainly a very severe picture. There were these other inconsistencies in the record where he was doing more or saying that he was doing more to his health care providers. So I would suggest this case is like Tomasetti, among many other of the Court's past cases cited in the briefing, where we have these claims of severe limitations from back pain, but then the ALJ is tasked with looking at these claims in light of all these different inconsistencies in the record. I'm sorry. What's the inconsistency, though, in terms of just daily activities, not a one-time thing? Because traveling, I could, even if I had severe back pain, if I really needed to get to California, I could endure it, and maybe when I got there I'd be laid up for a couple of days trying to recover. But that doesn't mean that if I'm put in a work setting where I have to do something for eight hours a day, 40 hours a week, that I can do that and still function. So that's why I guess I agree with you. If he was able to point to daily things that the man was able to do, that's different. But the one-time thing for the travel, I just don't see how that undermines Dr. Meyer's opinion. Certainly, Your Honor. Well, the ALJ did, I believe, in the decision, refer to him walking his dog. But I would like to say that even if Your Honor does not find the daily activities finding that persuasive, there are other very significant factors in this case about why the ALJ questioned his very extreme claims about his back pain. The objective evidence was quite benign with the mild imaging of the thoracic spine. The claims that he needed a cane and he would fall over, his own doctor, Dr. Meyer, later ordered a lumbar MRI looking into these issues, and the lumbar MRI was negative. And even as far as when Mr. Loader told Dr. Meyer, I fell over and injured myself, I lost my balance, Dr. Meyer himself said he could not explain and give a medical explanation for that. So there are real questions here about the objective evidence. And as far as the effectiveness of treatment, whether it was effective, certainly he did continue to complain of severe pain at times, but there are records where he says that he had an overall improvement since starting treatment with these conservative measures and that surgery was never recommended. Counsel, if I could move to the colloquy I had with your opposing counsel about the issue of depression, tell me, first of all, what's your interpretation of what the ALJ found at Step 2 with respect to depression, and then to what extent was that considered at Step 5 in the RFC? Yes, Your Honor. From the Commissioner's perspective, this is a fairly straightforward matter. The ALJ found that while he had a medically determinable impairment of depression, it was diagnosed by a doctor, as is required to establish it, that it did not cause significant limitations on his ability to perform basic work activities. Now, what is this? Did he say this at Step 2 or Step 5? At Step 2, Your Honor. At Step 2. So the conclusion was that it was a medically determinable impairment, but not significant and not sufficient to be concerned about? Yes, it did not rise to the level described in the regulations where it has to, and the regulations use a language of causing a significant limitation on the ability to perform basic work activities, and then basic work activities are described in another part of the regulations. So that finding, if we look at the actual evidence in this case, was actually very well supported, and the ALJ discussed that evidence. So we have the different treatment records, including from the nurse practitioners that plaintiff says were ignored, like N.P. White, where even though Mr. Loader is saying, I'm feeling depressed, I'm feeling irritable, when they are doing their observations and the mental status examinations, he's not showing real limitations on his mental functioning coming from this depression. And then the ALJ even went so far as to call a medical expert on this issue. So maybe there wasn't an examining source on this issue, but there was a testifying medical expert who looked at the records and said this individual doesn't have more than a mild limitation. Okay. As soon as he concludes mild limitation, depression, what is his obligation at Step 5, and was it met here? It was met here, Your Honor. I believe that Step 5, the rule is that the ALJ has to include the limitations, the credible supported limitations caused by all impairments, severe and not severe. So the fact of the matter was, in this case, what the ALJ found in the treatment notes and the medical expert's testimony was there wasn't any significant limitation. A de minimis limitation below that regulatory standard simply would not factor in. Well, did he simply ignore the depression element, or did he say what you just said at Step 5? At Step 5, Your Honor, I was looking through the decision here. I don't know if the ALJ referred to depression again under the RFC heading, but I believe it's the Terry case which says that the ALJ does not have to make findings under certain headings of the ALJ decision. So what we really have here is the ALJ discusses the depression issue pretty clearly at page 15 of the record, and we can see that continuing on, given how the regulatory framework. Page 15, is that while he's looking at 2? That's at Step 2, Your Honor. Okay. And then at 5, you're telling me that it never comes up at 5 or it does and he discounts it? Your Honor, I'm looking again at the RFC discussion. I'm not seeing a specific reference to depression, but I would not concede any error because of that. The ALJ adequately discussed it at Step 2. On the theory that whatever the depression was, it was not so significant as needed to be considered at 5. Exactly, Your Honor. And I think a crucial point here, too, is that Mr. Loader is talking about depression and talking about Dr. Meyer and these extreme claims, but even when we look at the moderate limitations and mental limitations Dr. Meyer described, those were not – he did not refer to depression when he was describing those limitations. He only refers to these complaints of pain in his explanations for those check boxes that he gave. So that really tends to undermine the claim that he has some sort of very severe depression that the ALJ somehow overlooked. It's a little bit obtuse, but the only thing I could find, and I'm referring to ER 16 of the ALJ's decision, is that at the residual functional capacity, Step 5, he does say in the following paragraph, in making this finding the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be expected as consistent with objective medical evidence, and then cites to a bunch of Social Security rulings and so on, and then goes on further below to talk about mental impairments generally as something that has to be considered along with the physical limitations. But I didn't find anything that expressly addresses Judge O'Scanlan's question. I would agree, Your Honor, from my rereading of the ALJ decision today. But this division in how the ALJ addressed it, addressing depression at Step 2, would reflect the understanding of the regulatory process and that once something is found to be not severe and there aren't any significant limitations, it sort of becomes a non-issue. If no medical source is saying that you have a significant limitation, such as a limitation to only simple routine tasks or working away from the general public. What did the vocational expert say? I have an indication that he testified that similar mental impairments, such as they were, would have changed his determination about the availability of gainful employment. Do you recall that? Your Honor, if I might retrieve my laptop. Sure. I have mine on the right. Your Honor, from my recollection, the vocational expert was talking about Dr. Meyer's limitations, which were, again, reflective of pain in the ALJ address and then rejected Dr. Meyer's opinion because it described a very severe degree of limitation that was not supported by the evidence. Would that be up to the expert to decide? The expert is sort of presented with, all right, here's the profile. Can this person find work? And if the mental depression issue is not identified, then it's not considered by the expert. If I understand Your Honor correctly, yes. The ALJ is the one tasked with presenting what we call the hypothetical individual to the vocational expert. And so the ALJ is determining what are the credible impairments. And the ALJs will typically pose two or three of these with various scenarios of different limitations and ultimately will pick the one after the hearing that they find most supported by the record. So if depression is not included in that because there's no valid real limitations coming from the individual's depression, there's no error whatsoever. Judge Talman, I'm sorry I took this over time here. I don't know. Are you anything further? Okay. Thank you very much, counsel. Thank you, Your Honors. Mr. Seidlitz, I think I promised you two minutes on rebuttal. Thank you. I'll try to only take one. Okay. In terms of responding, the focus I think has been or finished up there on the depression issues, one of the issues that happens, whether it's step two or step five, but ultimately when you pose the vocational consultant with the hypotheticals and they'll pick one that you can do cartwheels in the Cirque du Soleil, well, that person can work, and you get to the end, you can do nothing, they can't work, and then the ALJ will go back and pick depending on what facts they look at. The facts that didn't get presented, the facts that are ignored, are the limitations mentally. I'm going to focus just on the mental ones. From Dr. Meyer, April of 14, he found, based upon pain and the medications, that Kevin was going to have problems, moderate limitations in understanding, remembering complex instructions, carrying out those instructions, moderate limitations interacting with the public, supervisors, and coworkers. Are these all within the general range of depression? Is that your argument? No. Well, whether those come from depression, if those are from a social anxiety disorder, it doesn't matter what the mental issue is. Those are limitations if they're supported by an objective basis. Those are limitations that need to be submitted to the vocational consultant. But weren't? But were not. I see. Okay. They were not. And if they are incorporated into the vocational consultant, then they fit within his testimony that a person can't work if they're not able to react with the public for the specific eight-hour period. Thank you very much. Thank you, counsel. The case just argued is submitted. The last case on the calendar, Energy Investments v. Greehe Company, is submitted on the briefs, and we stand adjourned.
judges: O'scannlain, Tallman, Watford